**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WENDY S. WHIPKEY, | ) | |
| | ) | Civil Action No. 09-952 |
| Plaintiff, | ) | Judge Nora Barry Fischer |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff, Wendy Whipkey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA") 42 U.S.C. §§ 401-433, 1381-1383(f).  This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56 (Docket Nos. 7 and 10).  For the following reasons, Plaintiff's Motion for Summary Judgment [7] is DENIED and the Commissioner's Motion [9] is GRANTED, and the decision of the Administrative Law Judge denying DIB and SSI is hereby AFFIRMED.

## I.    Procedural History

The procedural history of this case is complex given Plaintiff's multiple filings and subsequent denials.  Plaintiff initially filed for DIB on May 4, 2001 alleging a disability due to residual effects from surgery for the bowel, bladder, and uterus with an onset date of October 24, 2000.  (Docket No. 5 at 256-258; 252-254)(hereinafter "R. at ___").  Plaintiff's claims were initially

denied by the Commissioner on August 20, 2001. (R. at 64).  Thereafter, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ").  (R. at 483-92).  A hearing was held before an ALJ on April 11, 2002.  (R. at 64-113).  Plaintiff appeared and testified, with the assistance of counsel.  (*Id.*).  On August 6, 2002, the ALJ issued a decision, denying Plaintiff's claims and concluding that Plaintiff was not disabled within the meaning of the Act.  (R. at 491-92). Plaintiff filed a timely appeal of the ALJ's unfavorable determination, and the Appeals Council subsequently denied the Plaintiff's request to review the ALJ's decision on December 27, 2002.  (R. at 493-495).

On January 2, 2003, Plaintiff filed a second application for DIB and a new concurrent application for SSI also alleging a disability onset date of October 24, 2000.  (R. at 508-526).  The Commissioner denied these claims on May 19, 2003.  (R. at 497-500).  Thereafter, Plaintiff filed a timely request for a hearing before an ALJ.  (R. at 501).  On December 8, 2003, a hearing was held before the same ALJ who had  made the previous determination.  (R. at 124-160).  On February 2, 2004, the ALJ issued a decision again denying Plaintiff's claims and concluding that Plaintiff was not disabled within the meaning of the Act.  (R. at 768-776).  Plaintiff filed a timely appeal of the ALJ's decision, and on September 22, 2005, the Appeals Council reversed the ALJ's February 2, 2004 decision and remanded the claims for further proceedings.  (R. at 777-780).  The Appeals Council instructed the ALJ on remand to consider additional evidence concerning Plaintiff's residual functional capacity, provide a rationale with specific references in the record in support of the assessed limitations, and to explain the weight given to examining source opinions.  (R. at 779). Finally, the Appeals Council instructed the ALJ to obtain evidence from a vocational expert to clarify the effect of the assessed limitations.  (*Id.*).

2

While Plaintiff's request for review was pending with the Appeals Council, Plaintiff filed a third application for DIB and a new application for SSI on April 28, 2005, still alleging a disability onset of October 24, 2004, based on arthritis, irritable bowel syndrome, acid reflux, bladder problems, back and stomach pain, bowel problems, gastritis, headaches, and the effects of uterus surgery. (R. at 25, 800-839).  These applications were denied initially on July 26, 2005, and Plaintiff subsequently made a timely request for hearing.  (R. at 25).  As a result of the Appeals Council's September 22, 2005 Order reversing and remanding the February 2, 2004 decision, these claims were rendered "duplicates" and were associated with Plaintiff's earlier claims.  (R. at 779).  A hearing was held before a new ALJ on July 6, 2006.  (R. at 166-224).  On January 25, 2007, the new ALJ issued a decision denying both applications for benefits, concluding for the third time that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 23-33).  The Appeals Council declined to review the decision of the ALJ on May 29, 2009.  (R. at 9-11).  Having exhausted all of her administrative remedies, Plaintiff filed this action on July 22, 2009.  (Docket No. 1).  Plaintiff filed her Motion for Summary Judgment and Brief in Support on October 29, 2009 (Docket Nos. 7 and 8), and the Commissioner filed its Motion for Summary Judgment and Brief in Support on November 18, 2009 (Docket Nos. 9 and 10).

## II.     Factual Background

### A.     General Background

Plaintiff was born on May 29, 1973, making her 27 years old as of her alleged onset date, and she was 28, 30, and 34 respectively at the time of each of her hearings before an ALJ.  (R. at 66, 116, 166).  Plaintiff is 6'1" and weighs approximately 215 pounds.  (R. at 170, 171).  Plaintiff has completed high school and is a single mother who lives with her mother and her 10 year old son.

(R. at 171-174).  Plaintiff's past relevant work[1] includes work as an assistant manager at a Family Dollar store, work at a brake shoe factory, sewing machine operator, and seasonal housekeeper at Seven Springs resort.  (R. at 177-184).

**B.    Plaintiff's Medical Background**

  *1.    Plaintiff's Records from Magee Women's Hospital Regarding her Uterine Prolapse Surgery*

Plaintiff's medical background since her initial surgery is also complex, involving numerous doctors, hospitals, emergency room visits, and procedures.  Plaintiff's initial injury to her abdominal area occurred as she was unloading a truck while working at Family Dollar.  (R. at 118, 180).  As she was lifting a box, Plaintiff felt something "pop" in her stomach.  (*Id.*).  She reported the injury to her supervisor and sought medical treatment.  (*Id.*).  She saw Dr. Alison Swift, M.D. at Magee Women's Hospital ("Magee") in Pittsburgh, PA.  Dr. Swift subsequently released her to work with a restriction of no lifting of any weight.  (*Id.*).  Plaintiff was diagnosed with uterine prolapse.[2]  On October 24, 2000, Plaintiff was readmitted to Magee where she underwent surgery, specifically a bilateral paravaginal defect repair, McCall culdoplasty[3], cystoscopy[4] with stent placement and

---

[1]

  Past relevant work is defined as work that a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it.  40 C.F.R. § 404.1560(b)(1).

[2]

  A "prolapse" is "a sinking of an organ or other part, especially its appearance at a natural or artificial orifice."  STEDMAN'S MEDICAL DICTIONARY 1573 (28th ed. 2006).

[3]

  A "culdoplasty" is "plastic surgery to remedy relaxation of the posterior fornix of the vagina." *Id.* at 468.

[4]

  "Cystoscopy" is "the inspection of the interior of the bladder by means of a cystoscope." *Id.* at 486.

removal, and posterior repair with perineorrhaphy.[5]   (R. at 570-571).   Plaintiff "tolerated the

procedure well." (*Id.*).  Plaintiff's post-operative diagnosis was severe pelvic relaxation, third-degree

cystocele[6], gaping introitus[7] and bilateral paravaginal defect repairs, greater on left than on right.  (R.

at 571).  Plaintiff was prescribed Vicodin[8] for pain.  Plaintiff returned to Magee Women's Hospital

five times for post-operative check-ups with Dr. Swift on November 6, 2000, November 21, 2000,

December 19, 2000, February 8, 2001 and June 5, 2001.  (R. at 312-317).  All follow up exams were

normal and the incision was healing well.  (*Id.*).  Plaintiff complained of having difficulty urinating,

noting she had to self-catheterize at least twice daily.  (*Id.*).

> ### 2.   *Plaintiff's Records from Doctors Krafty,  Alsaadi, and Reddi from July 18, 2001 through January 21, 2003*

Plaintiff continued to complain of abdominal pain and underwent additional tests, including

a pelvic ultrasound conducted by Dr. Swift on July 13, 2001.  (R. at 337).  The results of the

ultrasound were normal but indicated that Plaintiff had possible polycystic ovaries.  (*Id.*).  In July

of 2001, Plaintiff began to see Mary Beth Krafty, M.D. because Dr. Swift left for Washington.  (R.

at 95).  On July 18, 2001, Plaintiff underwent an 2-D echocardiogram with Doppler.  (R. at 729).

---

[5]

"Perineorrhaphy" is the "suture of the perineum," which is the "surface area between thighs extending from the coccyx to the pubis." *Id.* at 1459-60.

[6]

A "cystocele" is a hernia of the bladder, usually into the vagina and introitus.  *Id.* at 488.  A third-degree cystocele is external to the introitus. http://www.merck.com/mmpe/sec18/ch250/ch250b.html (last visited November 24, 2009).

[7]

"Introitus" is the entrance into a canal or hollow organ, as the vagina. STEDMAN'S MEDICAL DICTIONARY at 995.

[8]

Vicodin is a tablet containing a combination of acetaminophen and hydrocodone that is used to relieve moderate to severe pain.  *See* www.drugs.com; last visited December 2, 2009.

The findings of this test were "essentially normal." (*Id.*).  Dr. Krafty examined Plaintiff again on August 21, 2001, and the findings of that examination were also within normal limits.  (R. at 329, 760).  Dr. Krafty considered Plaintiff's gallbladder as a possible source for her abdominal pain and ordered an ultrasound of Plaintiff's gallbladder on August 23, 2001.  The ultrasound showed "an echogenic focus within the gallbladder lumen measuring 1.5 cm in greatest diameter consistent with a gallstone." (R. at 332).

Dr. Krafty referred Plaintiff to Dr. Khaldon Alsaadi, M.D., who examined Plaintiff on September 10, 2001 and determined that she had recurrent calculus cholecystitis[9] as documented on her gallbladder sonogram. (R. at 327).  On September 24, 2001, Dr. Alsaadi performed a laproscopic cholycystectomy on Plaintiff.  (R. at 326).  During the procedure, Dr. Alsaadi also examined Plaintiff's abdomen and found the liver, stomach and large and small intestines to be "unremarkable." (*Id.*).  Following the cholycystectomy, Dr. Alsaadi examined Plaintiff on October 1, 2001 and again on October 23, 2001.  (R. at 340-41).  Plaintiff still complained of attacks of abdominal pain in the upper-left quadrant of her abdomen that radiated around to her back and lasted from a half hour to an hour, and Dr. Alsaadi ordered an upper-endoscopy[10] with biopsy on November 2, 2001.  (R. at 340-343).  The endoscopy showed a clear duodenum and no evidence of any ulcers

---

[9]

A calculus is a concretion formed in any part of the body, most commonly in the passages of the biliary and urinary tracts, usually composed of salts and of inorganic or organic acids, or of other material such as cholesteral.  Cholecystitis is inflammation of the gallbladder.  STEDMAN'S MEDICAL DICTIONARY 289, 365.

[10]

An endoscopy is an examination of the interior of a canal or hollow viscus by means of a special instrument.  *Id.* at 642.

6

or duodenitis.  (R. at 343).  The antrum of the duodenum "was involved with moderate gastritis,[11] mainly bile gastritis."  (*Id.*).  There was also a large amount of bilious material in the stomach, and "[m]oderate reflux was observed without any ulcerations."  (*Id.*).  The post-operative diagnosis was "mild bile gastritis with reflux."  (*Id.*).

On November 5, 2001 the upper endoscopy was followed up with a CT scan of Plaintiff's abdomen and pelvis with and without contrast.  (R. at 345).  The scan showed no abnormalities on the liver, and the spleen, pancreas, adrenal glands and both kidneys appeared unremarkable.  (*Id.*). The urinary bladder was also unremarkable; however, follicular type cysts were seen in both ovaries, and there also appeared to be a small area of localized free fluid.  (*Id.*).  Dr. Frank Papa, M.D., who performed the examination, noted that if this was of clinical interest, an ultrasound of the pelvis was recommended for further evaluation.  (*Id.*).

Dr. Alsaadi examined Plaintiff again on November 15, 2001 and ordered the pelvic ultrasound on November 20, 2001.  (R. at 339).  Also, to combat the heartburn and reflux symptoms, Dr. Alsaadi prescribed Prevacid.[12]   On that date, Plaintiff underwent a transabdominal and transvaginal pelvic ultrasound.  (R. at 344).  The ultrasound showed hemorrhagic cysts on Plaintiff's left ovary, but her right ovary and uterus appeared normal.  (*Id.*).  Plaintiff was to follow up with Dr. Alsaadi in one month (R. at 339), but no further medical records from Dr. Alsaadi appear in the record.

---

[11]

Gastritis is inflammation, especially mucosal, of the stomach.  *Id.* at 790.

[12]

Prevacid is a prescription drug that decreases the amount of acid produced in the stomach and is used to treat and prevent stomach and intestinal ulcers, erosive esophagitis (damage to the esophagus from stomach acid), and other conditions involving excessive stomach acid.  *See* www.drugs.com/prevacid.html; last visited December 3, 2009.

On January 9, 2002, Plaintiff returned to the Blue Unit of Magee Women's Hospital complaining of vaginal bleeding and underwent a pap smear, the results of which appeared within normal limits.  (R. at 394).   Plaintiff visited the Highlands Hospital emergency room in Connellsville, Pennsylvania on January 10, 2002 complaining of epigastric and abdominal pain, but her objective findings appeared normal. (R. at 667-674).  Dr. Krafty prescribed Vicodin for the Plaintiff to take as needed for her pain.  (R. at 674).  Plaintiff returned to Dr. Krafty on January 24, 2002, this time complaining of abdominal and back pain.  (R. at 354).   While the physical examination was normal, Dr. Krafty ordered x-rays of the thoracic and lumbar spine.  (*Id.*).  Plaintiff underwent said x-rays on January 25, 2002, and each appeared normal.  (R. at 356).

On January 31, 2002, Plaintiff visited Dr. Radha Reddi at the Blue Unit of Magee Women's Hospital for a reevaluation of her abdominal pain.  (R. at 577).  Dr. Reddi ordered another Pelvic ultrasound for March 8, 2002.  (*Id.*).

Between visits with Dr. Reddi, Plaintiff again visited Dr. Krafty on February 14, 2002 complaining of persistent stomach pain going around her abdomen to her back.  (R. at 721).  To further investigate Plaintiff's complaints of epigastric and back pain, Dr. Krafty ordered a magnetic resonance imaging ("MRI") of Plaintiff's lumbar and thoracic spine.  (R. at 727-728).  Plaintiff went to Open MRI of Connellsville to undergo the procedure.  (R. at 727).  The MRI of the lumbar spine showed "early degenerative disc disease at L2-3 and L5-S1.   No definitive disc herniation or stenosis, however, can be seen."  (*Id.*).   The MRI of the thoracic spine showed "no definite  disc herniation or stenosis"[13] and found "no definite abnormality of the thoracic cord."  (R. at 728).

---

[13]

"Herniation" is protrusion of an anatomic structure from its normal anatomic position.  STEADMAN'S MEDICAL DICTIONARY at 881.  "Stenosis" is a stricture of any canal or orifice.  *Id.* at

8

Plaintiff again saw Dr. Krafty on March 5, 2002, complaining of shortness of breath.  (R. at 725.)  Dr. Krafty ordered a chest x-ray, which showed no acute pulmonary disease.  (*Id.*).

Plaintiff visited the Highlands Hospital emergency room on March 6, 2002, but no abnormalities were found.  (R. at 655-662).  Plaintiff underwent the transvaginal and transabdominal ultrasound as scheduled on March 8, 2002, and ultrasound returned normal results but again showed possible polycystic ovaries.  (R. at 384).  Plaintiff followed up with Dr. Krafty on March 14, 2002, again complaining of persistent stomach pain.  (R. at 720).  On the progress notes from these respective visits, it is noted that a Dr. Reddi from Magee Women's hospital also examined Plaintiff, noting that Plaintiff complained that her bladder and uterus felt as if they were dropping.  (R. at 720-721).

Plaintiff again visited the emergency room of Highlands Hospital on May 2, 2002 complaining of rectal bleeding, but again no abnormalities were found.  (R. at 644-645).  On May 3, 2002, Dr. Krafty ordered images of Plaintiff's abdomen, and the gas pattern was normal with no dilation of the colon or small intestine seen.  (R. at 653).

Dr. Krafty ordered a colonoscopy for Plaintiff on May 13, 2002 to investigate her continued complaints of rectal bleeding and abdominal pain.  (R. at 730-731)  Dr. Robert E. Schoen, M.D., M.P.H. performed the procedure.  (*Id.*).  The colonoscopy revealed no lesions or polyps, and in the places where he could see the mucosa[14] of the colon, "the mucosa was pink and normal in appearance without evidence of colitis."  (*Id.*).  Dr. Schoen also noted that Plaintiff appeared to

---

1832.

[14]    "Mucosa" is a mucus tissue lining various tubular structures consisting of epithelium, lamina propria, and in the digestive tract. STEDMAN'S MEDICAL DICTIONARY at 1234.

suffer a degree of discomfort with the colonoscope that is "out of proportion" given the medications administered during the procedure.  (R. at 731).

Plaintiff made two visits to Frick Hospital in Mt. Pleasant, PA in June and July of 2002.  (R. at 732-733).  On June 19, 2002, Plaintiff went to the emergency room of Frick Hospital complaining of fluttering in her chest and feeling light-headed.  (R. at 733).  Dr. Thomas S. Talkowski ordered chest x-rays, which showed clear lungs, a heart that was not enlarged and otherwise gave no impression of active disease of the chest.  (*Id.*).  Plaintiff returned to the emergency room of Frick Hospital on July 24, 2002 complaining of abdominal pain.  (R. at 732).  The emergency room doctors ordered abdominal x-rays which returned a "nonspecific radiographic appearance of the abdomen" and showed "no active disease of the chest."  (*Id.*).  Between these two emergency room visits at Frick Hospital, Plaintiff again visited Dr. Krafty on July 9, 2002, making additional complaints of abdominal pain and increased lower back pain.  (R. at 753).

Plaintiff continued to complain of abdominal pain, so in August of 2002, Dr. Krafty referred Plaintiff to a gastroenterologist, Dr. C. Rao Punukollu, M.D.  (R. at 752).  Dr. Punukollu examined Plaintiff on August 29, 2002 and ordered additional testing.  (R. at 608-609).  On September 12, 2002, Plaintiff underwent an "esophogogastroduodenoscopy with gastric antral biopsies"[15] to "evaluate the upper gastrointestinal tract and rule out active peptic ulcer disease or bezoar."(R. at 734-735).  Plaintiff "tolerated the procedure well." (R. at 735).  Based on this test, Dr. Punukollu diagnosed Patient with "Gastroesophageal reflux disease with hiatal hernia"[16] and "Gastroparesis

_____

[15]

An "esophogastroduodenoscopy" is an endoscopic examination of the esophagus, stomach and duodenum usually performed using a fiberoptic instrument.  *Id.* at 671.

[16]

A "hiatal hernia" is a hernia of the part of the stomach through the esophogeal hiatus of the

with bowel reflux and gastritis." (*Id.*).  Because Plaintiff complained that Prevacid made her

constipated, Dr. Punukollu prescribed Prilosec.[17]  Also, Dr. Krafty's Progress Notes from Highlands

Hospital dated November 11, 2002 showed that the drugs Prevacid and Nexium gave Plaintiff

constipation, and it was recommended that Plaintiff start a trial period of the drug Protonix.[18]  (R.

at 718).

On January 7, 2003 Plaintiff again visited Dr. Krafty, this time complaining of a chest cold,

lower back pain and anxiety due to inability to work.  (R. at 717).  On January 21, 2003, Plaintiff

went to the emergency room at Highlands Hospital complaining of pelvic and ovarian pain and was

again examined by Dr. Krafty.  (R. at 611-620).  Dr. Krafty ordered another pelvic ultrasound, but

the results were unremarkable. (R. at 621, 748).  To help with the pain, Dr. Krafty prescribed 800

milligrams of Motrin.[19]  (R. at 617).

3.    *Plaintiff's Disability Examination by Dr. Victor Jabbour, M.D.*

_____

diaphragm." *Id.* at 879-80.

[17]

Prilosec decreases the amount of acid produced in the stomach and is used to treat symptoms of gastroesophageal reflux disease and other conditions caused by excess stomach acid.  *See* www.drugs.com/prilosec.html; last visited December 8, 2009.

[18]

Like Prilosec, Nexium decreases the amount of acid produced in the stomach and is used to treat symptoms of gastroesophageal reflux disease and other conditions caused by excess stomach acid.  *See* www.drugs.com/nexium.html; last visited December 8, 2009.  Protonix is a proton pump inhibitor that decreases the amount of acid produced in the stomach and is used to treat erosive esophagitis (damage to the esophagus from stomach acid) and other conditions involving excess stomach acid.  *See* www.drugs.com/protonix.html; last visited December 8, 2009.

[19]

Motrin is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs).  It works by reducing hormones that cause inflammation and pain in the body.  *See* www.drugs.com/motrin.html; last visited December 8, 2009.

The records also reveal that on April 22, 2003, Dr. Victor Jabbour, M.D. evaluated Plaintiff for the purposes of a disability examination pursuant to her January 2, 2003 application for DIB and SSI.  (R. at 707-713).  Dr. Jabbour noted three chief complaints: (1) "[n]eck pain, described as constant, mild to moderate" that "radiates to both shoulders" and has persisted for two years prior; (2) "[b]ack pain described as constant, moderate to severe, steady and does not radiate" that has persisted for about three years prior; and (3) "[a]bdominal pain about four times per day.  It last [sic] for about half to one hour.  This pain is located in the upper abdomen and she has no nausea or vomiting when she has this pain," which has persisted for "about three or four years"  (R. at 707).  The physical examination returned mostly normal results.  (R. at 709-711).  Dr. Jabbour found "mild tenderness over cervical spine area" in Plaintiff's neck and noted she has a "mild limitation" to the movement of both lower extremities.  (R. at 710).  Plaintiff was unable to squat and had "mild difficulty" getting on and off the examining table.  (*Id.*).  Dr. Jabbour's final diagnosis was neck and back pain "secondary to arthritis and possible disc disease," and abdominal pain "secondary to abdominal adhesion, peptic ulcer disease, gastroesophageal reflux, and hiatal hernia."  (R. at 711).  As to Plaintiff's ability to perform work related physical activities, Dr. Jabbour found that Plaintiff could lift 2-3 pounds frequently and up to 10 pounds occasionally, and carry up to 2-3 pounds frequently.  (R. at 714).  Plaintiff could stand and walk for only one hour or less in an 8-hour day.  (*Id.*).  Plaintiff could sit for less than 6 hours.  (*Id.*).  Also, Plaintiff could occasionally bend, kneel, stoop, crouch, balance and climb.  (*Id.*).

>    4.    *Plaintiff's Medical Records from September, 2003 through December, 2005,*
>          *including Records from Dr. Krafty, Dr. Manda, and Dr. Wilson*

On September 25, 2003, Plaintiff again visited Dr. Krafty, this time complaining of a runny

nose, cough, and cold along with abdominal pain and lower back pain.  (R. at 852).  Dr. Krafty

diagnosed Plaintiff with bronchitis and prescribed the antibiotic Augmentin and the cough syrup

Hitussin HC.[20]

On October 1, 2003, Plaintiff experienced neck pain, facial numbness and tingling on the left

side of her face along with blurred vision in her left eye and difficulty hearing with her left ear.  (R.

at 763).  Plaintiff was evaluated in the emergency department of Highlands Hospital, and Dr. Krafty

referred her to a neurologist, Dr. Karuna S. Manda, M.D.  (*Id.*).  Plaintiff explained to Dr. Manda

that she had a history of migraine headaches dating back to her childhood and currently suffers said

headaches once a month.  (*Id.*).  Plaintiff also described her abdominal pains to Dr. Manda.  (*Id.*).

Dr. Manda ordered an MRI and magnetic resonance angiography ("MRA")[21] of Plaintiff's brain, as

well as an electroencephalography[22] ("EEG"), and prescribed Neurontin[23] for migraine prophylaxis

---

[20]

Augmentin contains a combination of amoxicillin and clavulanate potassium and is an
antibiotic in a group of drugs called penicillins.  It is used to treat infections caused by bacteria,
including bronchitis.  *See* www.drugs.com/augmentin.html; last visited December 9, 2009.  Hitussin
HC is a combination of brompheniramine, hydrocodone, and phenylephrine that is used to treat nasal
congestion, sneezing, runny nose, itchy or watery eyes, and cough caused by allergies or the common
cold.  *See* www.drugs.com/hitussin-hc.html; last visited December 9, 2009.

[21]

An "MRA" is a minimally invasive medical procedure that uses a magnetic field, radiowaves,
and a computer to produce detailed images of blood vessels throughout the body.  *See*
http://www.radiologyinfo.org/en/info.cfm?pg=angiomr, *last visited* January 26, 2010.

[22]

An "electroencephalography" is the registration of electrical potentials of the brain recorded
by an electroencephalograph, a system to record said electrical potentials from electrodes attached
to the scalp.  STEDMAN'S MEDICAL DICTIONARY. at 621.

[23]

Neurontin is an anti-epileptic medication, also called an anti-convulsant.  Normally used to
treat epileptic seizures, it is also used to treat nerve pain related to the herpes virus and shingles.  *See*
www.drugs.com/neurontin.html; last visited December 9, 2009.

and Imitrex[24] for her headaches. (R. at 765). As for Plaintiff's abdominal pain, Dr. Manda diagnosed it as a possible "abdominal migraine" and recommended Reglan for her nausea and stomach problems.[25] (*Id.*).

On October 3, 2003, Plaintiff obtained an EEG during awake, drowsy and Stage II sleep states. (R. at 844.). The results of the EEG were "normal" at all three stages. (*Id.*). Plaintiff underwent an MRI and MRA of her brain on October 7, 2003 and the results were "unremarkable," and there was "no evidence of an aneurysm." (R. at 767).

Plaintiff returned to Dr. Manda on November 5, 2003 for a follow-up visit, again complaining of headaches and abdominal pain. (R. at 841-843). Plaintiff stopped taking the Neurontin "because of the side effects, which she claimed she could not tolerate." (*Id.*). Also, she did not take the Reglan regularly. (*Id.*). Prior to this second visit with Dr. Manda, Plaintiff was switched from Neurontin to Inderal, which she did take regularly.[26] Dr. Manda recommended that Plaintiff's Inderal dosage be increased to 120 milligrams and that she keep a "headache calendar." (R. at 843). Plaintiff was to follow up with Dr. Manda in four months subsequent to the trial period

---

[24]

Imitrex is a headache medicine that is believed to work by narrowing the blood vessels around the brain. It also reduces substances in the body that can trigger headache pain, nausea, sensitivity to light and sound and other migraine symptoms. *See* www.drugs.com/imitrex.html; last visited December 9, 2009.

[25]

Reglan is a drug that increases muscle contractions in the upper digestive tract, which speeds up the rate at which the stomach empties into the small intestines. Reglan is used short term to treat heartburn caused by gastroesophageal reflux in people who have used other medications without relief of symptoms. *See* www.drugs.com/reglan.html; last visited December 9, 2009.

[26]

Inderal is a beta-blocker, which affects the heart and circulation and may be used to treat migraine symptoms. *See* www.drugs.com/inderal.html; last visited December 9, 2009.

for her Inderal treatment, but there are no records of any such follow up visit in the record before this Court.

Plaintiff made numerous visits to Dr. Krafty and Highlands Hospital from November 25, 2003 through 2005.  (R. at  845-852).  On November 25, 2003 Plaintiff returned to Dr. Krafty because her bronchitis had not yet cleared up and she continued to cough and wheeze.  (R. at 851). Plaintiff had a chest x-ray on January 1, 2004 at Highlands Hospital that revealed normal results and gave no impression of acute pulmonary disease.  (R. at 905).  Progress Notes dated March 4, 2004 reveal another visit to Dr. Krafty in which Plaintiff again complained of the "same old" lower back pain and the "same old pelvic pain."  (R. at 850).  Also, Dr. Krafty noted a "big mix up" in the records on Plaintiff's disability case.  (*Id.*).  The records also show that on June 12, 2004 Plaintiff again visited the emergency room of Highlands Hospital complaining of light-headedness and dizziness, but there were no abnormal findings in her vital signs, physical assessment or blood work. (R. at 898-904).  Progress Notes dated July 27, 2004 show another visit to Dr. Krafty during which Plaintiff reported the same stomach and back pain as well as a repeat sinus infection.  (R. at 849). Dr. Krafty prescribed Lorcet.[27]  Dr. Krafty ordered a CT scan of the paranasal sinuses on August 3, 2004.  (R. at 849, 853).  The results of said scan were "unremarkable."  (R. at 853).  Plaintiff underwent an ultrasound of the left breast and a  mammogram on January 26, 2005, both of which returned normal results and showed no malignancy.  (R. at 855).  Progress Notes dated February 17, 2005 show that Plaintiff again visited Dr. Krafty with a sore chest, noting that one year prior her

---

[27]

Lorcet is a combination of a narcotic analgesic (painkiller) and cough reliever with a non-narcotic analgesic for the relief of moderate to moderately severe pain.  *See* www.drugs.com/pdr/lorcet.html; last visited December 9, 2009.

boyfriend "lambasted" her in the chest. (R. At 847). Dr. Krafty ordered a chest x-ray, which showed normal chest and ribs. (R at. 847, 897, 934). Progress Notes dated May 3, 2005 show another visit to Dr. Krafty regarding a sinus infection. (R. at 846). Also noted is that Plaintiff was having trouble regarding her ex-boyfriend and custody of her son. (*Id.*). Plaintiff had bloodwork done on June 9, 2005 that showed apparently normal counts. (R. at 894-895).

On October 6, 2005, Plaintiff, experiencing further symptoms of prolapse, visited Dr. Christine Wilson, M.D. to "see if [her] insides fell out again." (R. at 918). Plaintiff described her history to Dr. Wilson, and noted that over the previous month she had been "experiencing a pelvic pain, which is not localized." (*Id.*). Additionally, Plaintiff noted that occasional bouts of stress incontinence requiring her to " take a laxative, maybe once a month, and she will have to put pressure on the vagina to achieve a bowel movement on occasion, although that has been happening since the original prolapse occurred." (*Id.*). She stated that she does not want a "pessary," as she had tried one with the original prolapse, and is willing to consider a hysterectomy if that is the best option for her.[28] (*Id.*). Dr. Wilson ordered a transpelvic and transvaginal ultrasound, which was performed on October 13, 2005. (R. at 919, 932). The test showed a "large right simple ovarian cyst." (R. at 932).

Plaintiff returned to Dr. Krafty on October 18, 2005 again complaining of "stomach pain all the time." (R. at 845). Dr. Krafty noted an epigastric tear, and prescribed Prilosec for the reflux and Lorcet for the lower back pain. (*Id.*). On December 2, 2005, Plaintiff made another visit to Highlands Hospital emergency room, complaining of pain in the right rib area "that comes and

---

[28]

A "pessary" is an appliance of varied form, introduced into the vagina to support the uterus or to correct any displacement. STEDMAN'S MEDICAL DICTIONARY at 1468.

goes." (R. at 883-884).  A Dr. Stept prescribed Motrin 600 milligrams to be taken as needed for pain.  (R. at 884).  On December 18, 2005, Plaintiff experienced symptoms of bronchitis again and visited the emergency room at Frick Hospital.  (R. at 860-870).  A chest x-ray taken that day returned normal results and revealed no evidence of pneumonia.  (R. at 860).  Plaintiff was, however, diagnosed with bronchitis and prescribed an Albuterol inhaler.[29]

### 5.    Dr. Krafty's Undated Check-box Report

Sometime in 2002, Dr. Krafty filled out a "Medical Questionairre to Determine Physical Capacities."  (R. at 359-362).  Dr. Krafty noted Plaintiff could sit for an entire eight-hour workday, could stand and walk for four hours, but needed complete freedom to rest throughout the day.  (*Id.*).  The report noted no other physical limitations.  (*Id.*).

### 6.    Plaintiff's Disability Examination with Dr. Muna Jabbour, M.D.

The records also reveal that on January 5, 2006, Dr. Muna Jabbour, M.D. evaluated Plaintiff for the purposes of a disability examination.  (R. at 871-881).  Dr. Jabbour noted that Plaintiff has a history of "multiple nonspecific complaints including headaches, bronchitis, history of pneumonia, abdominal discomfort and indigestion, history of arthritis, low back pain, and neck pain."  (R. at 873).  Dr. Jabbour's overall impression of Plaintiff was "[h]istory of GERD disease, history of gastroparesis, history of degenerative arthritis and neck pain with moderate or mild decrease on range of motion in the lower back.  She was walking in and out.  She was able to get on and off the examining table."  (R. at 873).  In the Medical Assessment of Ability to do Work-Related Activities, Dr. Jabbour noted no impairments for either lifting, carrying, standing, walking, sitting, pushing,

---

[29]

Albuterol is a bronchodilator that relaxes muscles in the airways and increases airflow to the lungs.  *See* www.drugs.com/albuterol.html; last visited December 9, 2005.

pulling, seeing, or feeling.  (R. At 878-881).  Additionally, Dr. Jabbour found that Plaintiff could

occasionally climb, stoop, kneel, balance, crouch, and crawl.  (R. at 879).

> 7.   *Plaintiff's Medical Records from January through May of 2006, including*
> *Dr. Wilson's History and Physical Notes and Records from Uniontown*
> *Hospital*

In early 2006, Plaintiff made several visits to Dr. Wilson, now at the Uniontown Hospital in

Uniontown, Pennsylvania seeking treatment for her infertility as well as for her continuing

abdominal pain.  (R. at 913-915, 944-965).  Plaintiff noted on January 17, 2006 that she was unsure

of her desire to have a hysterectomy because she wanted to have another baby.  On February 6, 2006,

Dr. Wilson performed a hysterosalpingography, which showed no abnormal results.[30]  (R. at 944).

Around March, 2006, Plaintiff had a change of heart regarding the hysterectomy, stating on March

30, 2006 that she "just wants the surgery done."  (R. at 951).  The procedure was scheduled for May

19, 2006.  (*Id.*).  On that date, Plaintiff underwent a vaginal hysterectomy, uterosacral ligament

suspension,[31] posterior colporrharphy[32] with Pelvichol xenograft[33] and repeat perineorrhaphy.  (R.

at 961).  The surgery was successful, and Dr. Wilson observed her through June 26, 2006.  (R. at

950).  There are no additional records indicating any treatment for abdominal pain past this surgery.

---

[30]

A "hysterosalpingography" is a radiography of the uterus and fallopian tubes after an injection of radiopaque materials.  STEDMAN'S MEDICAL DICTIONARY at 941.

[31]

A "uterosacral ligamanet suspension is a suspension of the ligaments of the uterus and sacrum."  *See id.* at 2078.

[32]

A "colphorrharphy" is the repair of a rupture of the vagina by excision and suturing of the edges of the tear.  *Id.* at 413.

[33]

A "xenograft" is a graft transferred from an animal of one species to that of another species.  *Id.* at 2158.

C.     **Administrative Hearing and ALJ Decision**[34]

Plaintiff, represented by counsel, appeared and testified at the administrative hearing on July 6, 2006. (R. at 166-224).  Plaintiff testified that she was employed up until the date of her initial prolapse surgery on October 23, 2000. (R. at 181).  Plaintiff described her symptoms as "pains like in my abdomen, through my back."  (R. at 188).   Around the time of her first surgery, Plaintiff described the pain as feeling like "all your guts are falling out of you."  (R. at 202).   The pain allegedly starts in Plaintiff's abdomen and travels around her side to the middle of her back, doubling her over.  (R. at 206).   These pains can last from 15 to 45 minutes.  (*Id.*).   To deal with these pains, Plaintiff "goes all over the place," sitting, rocking back and forth, doing whatever it takes to alleviate them.  (R. at 207).   Additionally, Plaintiff testified that she has difficulty swallowing food which caused her to have difficulty breathing.  (R. at 189).   Plaintiff stated that these symptoms had a severe impact on her life, limiting her daily activities to showering, occasionally fixing her ten-year-old son a bowl of cereal, and laying around.  (R. at 190-192).   She allegedly cannot drive very far.  (R. at 174).  According to Plaintiff, Dr. Wilson told her she cannot lift anything heavier than a gallon of milk.  (R. at 191).   Prior to the October 24, 2000 surgery, Plaintiff was able to do household chores such as mowing the lawn.  (R. at 193).   As for walking and standing, Plaintiff testified that she is only able to walk for 15 to 30 minutes before the lower back and stomach pains start up.  (R. at 197-198).  Once the pains start, Plaintiff says she rests for up to three hours.  (R. at 198).  Plaintiff

---

[34]

Plaintiff testified before an ALJ on three separate occasions in 2001, 2002, and 2006.  *See* Part B *supra*.  Because the ALJ decision of January 25, 2007 is under review, the Court will focus on the administrative hearing of July 6, 2006 from which that decision issued.

testified she does go shopping with her mother at the Wal-Mart two miles from her current residence. (R. at 194).  Plaintiff also alleges that the pain symptoms somewhat limited her care for her son.  (R. at 195) She did not attend parent-teacher conferences but did go to a Mother's Day event at his school.  (*Id.*).  Plaintiff says she has suffered from acid reflux disease and irritable bowel syndrome and otherwise has felt as if her insides were falling out.  (R. at 188).

In regards to her work experience, Plaintiff testified that while in the tenth through twelfth grade, she was employed in food service doing cooking and culinary work.  (R. at 177).  She also testified that prior to working at the Family Dollar, she worked at a brake shoe factory first as a laborer then as a warehouse manager.  (R. at 185).  Plaintiff stated that when the factory went out of business, she worked as a clothing inspector at a sewing factory.  (R. at 186).  She also stated that in 1991 she worked at a distribution company.  (R. at 187).  Also, between 1991 and 1995, Plaintiff worked as a maid at the Seven Springs resort.  (*Id.*).  From 1996 until her surgery in 2000, Plaintiff worked as an employee then as an assistant manager at Family Dollar.  (R. at 177).

Vocational expert ("VE") Larry Ostrowski[35] evaluated Plaintiff's employment and medical background at the administrative hearing (R. at 215-224).  The VE noted that in addition to the jobs Plaintiff described, her work history report reveals she also worked in a deli as a deli cutter.  (R. at 221).  Assuming the Plaintiff could do light work, the VE testified she could return to her job as a table worker or maid.  (R. at 221-222).  Also, assuming that Plaintiff could do only six hours of standing or walking in an eight-hour day, Plaintiff could only perform her past work as a table worker.  (R. at 222).  However, if given the limitation of needing two hours out of an eight-hour day

---

[35]

Claimant's attorney did not object to his qualifications.

to go off-task and lay down, the VE stated Plaintiff could perform none of her past relevant work. (R. at 223).

The ALJ determined that Plaintiff's medically determinable impairments did not meet the requirements for receipt of DIB or SSI and that Plaintiff maintained the ability to perform at least some of her past relevant work. (R. at 25-36). Additionally, the ALJ noted that Plaintiff's pain did not preclude her from working during the 10 months between the alleged "pop" in her stomach and her first surgery. (R. at 33). Also, the ALJ found that Plaintiff's impairment-related complaints as well as her dramatically escalating complaints of neck and back pain lack credibility for several reasons. (R. at 30-34). First, the ALJ opined that given Plaintiff's need to provide primary care for a young child, it is in her interest to remain eligible for welfare. (R. at 31). Second, the ALJ found that since her October 2000 surgery, Plaintiff had "demonstrated significant, long-term reliance on oxycodone and hydrocodone, both highly addictive narcotic pain medications." (*Id.*). "By registering ongoing complaints of severe or chronic pain and by maintaining her eligibility for medical coverage (which might be compromised by accepting suitable employment), she ensures her ongoing ability to obtain such addictive medications." (R. at 32). Third, the ALJ noted that in January 2002, Plaintiff was in the midst of a lawsuit against a physician for purported complications arising from a surgical procedure. (*Id.*). Fourth, the ALJ found that the objective medical evidence weighed against her subjective complaints, noting that her physicians, including Dr. Krafty, frequently described her as "otherwise healthy." (R. at 32-33). Accordingly, the ALJ found that Plaintiff had not been under disability, as defined by the Social Security Act, since the previous ALJ determination on August 7, 2002 through September 30, 2004. (R. at 36).

## III.   Standard of Review

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir.2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D.Pa.1998). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706.

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1) (A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir.1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent her from performing his past

22

relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir.1986).

## IV.   Discussion

In her Motion for Summary Judgment, Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ credibility determinations were not supported by substantial evidence, specifically that the ALJ was biased; and (2) the ALJ improperly rejected the opinion of Plaintiff's treating physician, Dr. Krafty.  (Docket. No. 8).   The Commissioner's Motion for Summary Judgment counters that the record gives no indication that the ALJ prevented Plaintiff from receiving a full and fair hearing and that the ALJ gave proper weight to Dr. Krafty's opinion in accordance with the regulations and case law.  (Docket No. 10).

### A.   The ALJ's Credibility Determinations are Supported by Substantial Evidence and the ALJ was not Biased

As to the first issue, Plaintiff argues that the ALJ erroneously concluded that Plaintiff remained capable of performing her past relevant work as an assembler/packer/table-worker at a brake factory based on an improper credibility determination not supported by substantial evidence. (Docket No. 8 at 9-12).  Specifically, Plaintiff argues that: (1) the ALJ was predisposed to rule against Plaintiff because of her prior denials; and (2) the ALJ demonstrated bias by stating that Plaintiff was solely motivated by secondary gain and was abusing narcotic pain medications.  (*Id.*).

23

The Commissioner counters that Plaintiff has not shown the ALJ failed to render a fair judgment and that his credibility determinations are supported by substantial evidence.  (Docket No. 10 at 9-12).

Due process requires that social security claimants be afforded a full and fair hearing. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995).  The ALJ has a duty to develop a full and fair record in a social security case.  *Id.*  "Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits."  *Id.* (citing *Hess v. Secretary of Health, Ed. and Welfare*, 497 F.2d 837, 841 (3d Cir. 1974).  An ALJ is presumed to be unbiased absent a specific showing a specific showing for cause to disqualify.  *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665 (1982); *see also Maher v. Astrue*, Civ. A. No. 08-156J, 2009 WL 3152467, * 4(W.D. Pa. Sept. 30, 2009).  The burden to establish a disqualifying interest rests with the party asserting bias.  *Schweiker*, 456 U.S. at 196.  A party asserting bias must show that the attitude and behavior of the ALJ was "so extreme as to display clear inability to render a fair judgment."  *Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147 (1994); *see also Qun Wang v. AG of the United States*, 423 F.3d 260, 269 (3d Cir. 2003).

The ALJ must seriously consider subjective complaints which may support a claim for benefits, especially when the complaints are supported by medical evidence.  *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981).  In order to be considered, however, the subjective complaint must bear some relationship to the claimant's physical status, as demonstrated by objective medical findings, diagnoses, and opinions.  20 C.F.R. §§404.1526-29.  In making his or her determination, the ALJ must consider and weigh all of the evidence, medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and the ALJ must specifically explain his or her reasons for rejecting such supporting evidence.  *Burnett*

*v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000).  In addition, because of

his ability to observe the Plaintiff's demeanor, an ALJ's credibility finding is entitled to deference

and should not be discarded lightly.  *See Reefer v. Barnhart*, 326 F.3d 376, 280 (3d Cir. 2003).

       *1.*    *The ALJ was not Predisposed to Rule Against Plaintiff*

     At step four of the sequential evaluation in the decision of January 25, 2007, the ALJ briefly

discussed Plaintiff's prior denials:

> Thus, the claimant's three disability findings of records [sic] have to
> date been found lacking in merit in conjunction with six different
> intra-agency adjudicatory determinations.  Although she has clearly
> demonstrated her ongoing commitment to the compensable disability
> process, the undersigned has found little in the way of new, objective
> medical or otherwise compelling evidence that would warrant any
> fundamental disposition that is contrary to that which was initially
> reached on August 6, 2002, by Administrative Law Judge Gibbs
> following the April 2002 hearing.  Although the claimant's
> subjective, impairment-related complaints have since escalated both
> progressively and dramatically, the record contains insufficient
> objective medical evidence in support thereof.

(R. at 30).  Contrary to Plaintiff's argument that the ALJ selectively relied on Plaintiff's prior claim

history and was, therefore, predisposed to rule against her, the ALJ considered the entire record

before him and otherwise fully developed the record to reach his adverse credibility determination.

Additionally, Plaintiff provides no case law to support her contention that the above statement

"clearly revealed" the ALJ's predisposition to rule against her, and the Court through its research has

found no case law directly on point.  As will be discussed in greater detail below, the ALJ has

satisfied his duty to completely develop and consider the record as a whole and provide the Plaintiff

with a full and fair hearing, and this statement is not so extreme as to display the ALJ's clear

inability to render a fair judgment.

2.    *The ALJ was Unbiased in Determining Plaintiff's Statements were Less than Fully Credible*

At step four of the sequential evaluation, the ALJ also stated Plaintiff engaged in "secondary gain"[36] based on her previous worker's compensation claim as well as her history as a recipient of food stamps, a state medical card, and child support.  (R. at 30-31).  Further, the ALJ opined that Plaintiff continued to make complaints about head, neck and abdominal pain to obtain narcotic pain medication.  (R. at 31-33).  Plaintiff argues that the ALJ demonstrated bias by relying on these conclusions to determine Plaintiff lacked credibility.  (Docket No. 8 at 11-12).  The Commissioner counters that the ALJ considered the entire record in making his credibility determination and gave Plaintiff a full and fair hearing.  (Docket No. 10 at 9).  Reviewing the record as a whole, the Court finds numerous inconsistencies that could justify discounting Plaintiff's credibility regarding the severity of her neck, back, and abdominal pain.

*a. Plaintiff Made Few Efforts to Return to Work*

Plaintiff has made few efforts to return to work following her 2000 prolapse surgery, despite Dr. Swift reporting that Plaintiff was healing well.  (R. at 311-317).  Since August, 2002 Plaintiff has made no significant efforts to return to work.  (R. at 32).  In examinations subsequent to her surgery, Plaintiff's treating physician, Dr. Krafty, assured Plaintiff that she was "okay" with light duty work.  (R. at 315).

*b.    Inconsistencies in Plaintiff's Medical History*

Plaintiff's medical history reveals little objective evidence that supports her subjective

---

[36]

Secondary gain is defined as "[i]nterpersonal or social advantages (e.g. assistance, attention, sympathy) gained indirectly from organic illness. *See* http://www.mondofacto.com/facts/dictionary?secondary+gain, *last visited* January 26, 2010.

26

complaints of pain.  Although she consistently complained of abdominal pain in the months following the surgery, a pelvic ultrasound and echocardiogram taken in July of 2001 were unremarkable except for the presence of ovarian cysts.  (R. at 337, 760).  Dr. Krafty's initial examination of Plaintiff in August of 2001 was normal.  (R. at 760).  An ultrasound of Plaintiff's gallbaldder revealed gallstones.  (R. at 332).  Dr. Krafty then referred Plaintiff to Dr. Alsaadi, who diagnosed Plaintiff with recurrent calculus cholecystitis and subsequently removed her gallbladder.  (R. at 327).  An examination of Plaintiff's abdomen during the procedure revealed the liver, stomach, and large and small intestines to be "unremarkable".  (R. at 326).  Plaintiff continued to complain of abdominal pain, but tests, including an upper endoscopy and CT scan of her abdomen and pelvis returned unremarkable results, although "moderate reflux was observed."  (R. at 345).  Dr. Alsaadi performed another pelvic ultrasound on November 20, 2001, but the results showed that Plaintiff's right ovary and uterus appeared normal, with cysts on her left ovary.  (R. at 344).  Although she was to follow up with Dr. Alsaadi in a month (R. at 339), no further medical records from Dr. Alsaadi appear in the record.

As Plaintiff's medical history shows, Plaintiff made numerous visits to the emergency room of several hospitals, saw several doctors, including a gastroenterologist and a neurologist, underwent numerous tests, yet no doctor's examination or test revealed anything seriously wrong to account for Plaintiff's complaints of abdominal pain.  A pap smear on January 9, 2002, taken after complaints of vaginal bleeding appeared within normal limits.  (R. at 394).  An x-ray of her thoracic and lumbar spine appeared normal.  (R. at 356).  A February 14, 2002 MRI of Plaintiff's thoracic and lumbar spine showed "early degenerative disc disease" but showed no definitive disc herniation.  (R. at 727-728).  A March 8, 2002 pelvic ultrasound returned unremarkable results with the exception of the

27

cysts on Plaintiff's left ovary.  (R. at 384).  A visit to the Highlands Hospital emergency room on May 2, 2002 showed no abnormalities.  (R. at 644-645).  A May 13, 2002 colonoscopy showed no polyps, legions or evidence of colitis.  (R. at 730-731). In June of 2002, Plaintiff began to complain of chest pain, pain not necessarily associated with her prolapse, but chest x-rays showed clear lungs and no evidence of heart disease.  (R. at 732-733).

In 2003, Plaintiff began to complain of neck pain, facial numbness, tingling along the left side of her face and blurred vision in her left eye and difficulty hearing with her left ear.  (R. at 763). Again, these complaints do not appear related to her original injuries surrounding her prolapse surgery in October of 2000. Dr. Krafty referred Plaintiff to Dr. Manda, a neurologist, who performed an MRI and MRA of Plaintiff's brain, as well as an EEG, all of which appeared normal.  (R. at 765-767, 844).  After only three visits with Dr. Manda, Plaintiff ceased appearing for her scheduled follow-up visits.

Plaintiff continued to complain of neck, back, abdominal and chest pain between 2004 and 2005, yet repeated diagnostic and clinical testing was normal.  A chest x-ray on January 1, 2004 gave no impression of acute pulmonary disease.  (R. at 905). A CT scan of Plaintiff's paranasal sinuses was "unremarkable."  (R. at 853).  Bloodwork done on June 9, 2005 showed normal counts.  (R. at 894-895).  During an examination of October 6, 2005, Plaintiff stated she only complained of pelvic pain "over the past month or so" and did not take any pain medication for it.  (R. at 918).  Plaintiff complained of bronchitis symptoms on December 18, 2005, but a chest x-ray returned normal results.

In early 2006, Plaintiff began seeing Dr. Wilson, seeking not only relief from her abdominal pain but infertility treatment as well.  (R. at 913-915, 944-965).  However, by March, 2006,

Plaintiff's complaints of abdominal pains and renewed prolapse worsened to the point that she wanted a hysterectomy.  (R. at 951).

Because Plaintiff filed for DIB three times and SSI twice, she has been repeatedly examined for the purposes of receiving said benefits.  In an undated check-box report, Dr. Krafty noted Plaintiff could sit for an entire eight-hour workday, could stand and walk for four hours, but needed complete freedom to rest throughout the day.  (R. at 359-362).  The report noted no other physical limitations.  (*Id.*).  In her examination of Plaintiff on January 5, 2006, Dr. Muna Jabbour noted no impairments for either lifting, carrying, standing, walking, sitting, pushing, pulling, seeing, or feeling.  (R. At 878-881).  Additionally, Dr. Jabbour found that Plaintiff could occasionally climb, stoop, kneel, balance, crouch, and crawl.  (R. at 879).

Plaintiff consistently complained of varying degrees of abdominal, neck, back, and chest pain over a period of six years following her prolapse surgery, yet a battery of tests and examinations revealed little wrong with her.  Also of note, Plaintiff often drove herself to the emergency room when necessary.  (R. at 34).  Given this lack of objective medical evidence to support Plaintiff's inconsistent subjective complaints, it was proper for the ALJ to consider other evidence of record that brings into question Plaintiff's motivation for seeking DIB and SSI multiple times.

       c.     *Inconsistencies in Plaintiff's Statements about her Living Arrangements*

Plaintiff makes several inconsistent longitudinal statements regarding her household composition.  When Plaintiff initially applied for benefits in May, 2001, Plaintiff indicated that she was living with her son and a "boyfriend."  (R. at 279).  In December of 2003, Plaintiff wrote in a subsequent DBI and SSI application that she was subsisting upon her "boyfriend's income" while

providing primary care and custody for her own son. (R. at 568). In October, 2005 Plaintiff related at a medical visit that she lived with her "partner of 12 years" and their nine-year-old son. (R. at 918). However, in July of 2006, Plaintiff testified before the ALJ that she returned to live with her mother three years prior and had since taken up with a new "boyfriend." (R. at 171-172). These inconsistent statements from the Plaintiff, all contained in the record, support the ALJ's negative credibility finding.

*d.     Evidence of Secondary Gain*

Contrary to Plaintiff's argument, given the lack of objective medical evidence to support Plaintiff's subjective complaints of pain, the ALJ did not err by questioning her motivations for refusing to find new employment. Following her surgery, Plaintiff filed a workers' compensation claim and, eventually, applied for disability benefits. In addition to these filings, the record indicates that Plaintiff has been a longtime recipient of food stamps and a state medical card. (R. at 527-530, 531-540, 801, 809-816). These benefits, coupled with the duties of caring for a young child, likely provided Plaintiff with significant disincentive to seek new employment as well as an incentive to pursue all available public benefits. Finding work that accommodated her impairment-related claims may compromise her eligibility for these various public-assistance programs as well as her ability to receive worker's compensation and disability benefits. In addition, Plaintiff indicated that in January of 2002 she was in the midst of a lawsuit against a physician for alleged complications that arose during a surgical procedure. (R. at 732-733).

The ALJ is correct that he is required to consider all factors surrounding Plaintiff's subjective complaints absent objective medical evidence. *Burnett*, 220 F.3d at 119-20. Contrary to Plaintiff's assertions, the ALJ does not indicate that Plaintiff is pursuing her disability claims solely for

secondary gain.  Rather, the ALJ is questioning Plaintiff's motivation for not seeking employment and making continuous and inconsistent medical complaints in the glaring absence of objective evidence in the record to support such complaints.

> e.     The ALJ did not Offer a Lay Opinion Regarding Plaintiff's Reliance on Prescription Pain Medication

Plaintiff argues that the ALJ formed his own lay opinion and further demonstrated bias against Plaintiff when stating that "the claimant has since her October 2000 surgery demonstrated significant, long-term reliance upon oxycodone and hydrocodone, both highly addictive and narcotic pain medications."  (R. at 31).  While "[a]n ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence," *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), here the ALJ did not substitute his lay opinions for the opinions of Plaintiff's treating physicians.  Rather, the ALJ considered the evidence that Plaintiff made a wide range of inconsistent complaints that resulted in the prescription of addictive medications such as Vicodin,  Lortab , and Ativan despite the notable absence of any objective medical evidence to support her subjective complaints.  Although no treating physician expressed concern that Plaintiff may be abusing her pain medication, the record supports the ALJ's statement that Plaintiff demonstrated reliance on pain medication generally known to be addictive.  Throughout Plaintiff's medical history, her physicians frequently prescribed these medications.  (R. at 537, 567, 764, 838, 845, 872).  The ALJ observed that a person such as Plaintiff may not report a decrease in the severity of her symptoms in order to obtain additional prescriptions, thus negatively impacting Plaintiff's credibility.  (R. at 32).  Any observations as to the addictive qualities of the medications are recitations of commonly known fact that such medications are potentially addictive.

f.    *The ALJ's Statements do not Amount to Bias*

The ALJ's statements about secondary gain and prescription pain medication, although harsh observations of Plaintiff's circumstances, are not so extreme as to display the ALJ's clear inability to render a fair judgment.  In reviewing the record as a whole, the Court finds that the ALJ drew these conclusions only after careful consideration of the entire record before him and these statements are supported by substantial evidence in the record.  Therefore, these statements are not evidence that the ALJ was biased or otherwise predisposed to rule against her.

Overall, the ALJ provided Plaintiff with a full and fair hearing.  At the hearing of July 6, 2006, the ALJ asked Plaintiff about her current health, her medical history, her living arrangements, and her daily activities.  (R. at 170-212).  The VE testified as to Plaintiff's ability to perform either her past relevant work or other work that may exist in the national economy.  (R. at 212-224).  At all times during the hearing, Plaintiff was represented by counsel.  At no time did Plaintiff's counsel object to the ALJ's questions or the manner in which he asked them.  Nor did Plaintiff's counsel object to the testimony of the VE.  Furthermore, the ALJ meticulously performed each step of the five-step analysis.  In doing so, the ALJ did not fully discount Plaintiff's subjective complaints and found that she is limited to light work, such as that of her previous employment in the brake shoe factory.  (R. at 35-36).  The ALJ, therefore, fulfilled his duty to fully develop the record and considered and weighed the entire record consistent with the Act when determining whether Plaintiff was credible, providing several reasons for rejecting the scant evidence supporting Plaintiff's subjective complaints.  Accordingly, Plaintiff has failed to satisfy her burden to show bias on the part of the ALJ, and the ALJ's negative credibility determination is supported by substantial evidence in the record.

**B.     The ALJ did not err by discounting Dr. Krafty's report**

Plaintiff next argues that the ALJ improperly rejected the medical opinion of Plaintiff's treating physician, Dr. Krafty, that Plaintiff needed frequent rest throughout the day. (Docket No. 8 at 13-14). "A cardinal principle guiding eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (quoting *Plummer* 186 F.3d at 422, 429). The ALJ must weigh conflicting medical evidence and can choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Id.* at 317 (quoting *Plummer*, 186 F.3d at 429). The ALJ must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's assessment on the basis of contradictory medical evidence, not on the basis of the ALJ's own credibility judgments, speculation or lay opinion. *Id.* at 317-18.

In the ALJ's decision, the ALJ considers Dr. Krafty's opinion that Plaintiff required full freedom to rest throughout the day. (R. at 32). The ALJ accorded this opinion minimal weight due to the fact that it ran contrary to minimal objective findings which otherwise indicated that Plaintiff was an otherwise healthy woman who suffered from constipation and reflux. (*Id.*). The ALJ noted that elsewhere Dr. Krafty opined that Plaintiff could lift up to 20 pounds and sit for an entire eight-hour workday as well as stand and walk for four hours. (*Id.*). Regarding Plaintiff's complaints of back pain, the ALJ noted that the MRI of Plaintiff's lumbosacral spine revealed only early degenerative disc disease with no evidence of herniation or stenosis and that imaging of her thoracic spine was normal. (R. at 33). The ALJ noted the findings of Dr. Muna Jabbour, who found no medically determinable impairment that would have an impact on Plaintiff's ability to stand or walk.

The ALJ did consider Plaintiff's significant weight fluctuations and found they may intermittently produce or contribute to some symptoms of low back or other musculoskeletal pain, and possibly somewhat limit mobility and endurance. (R. at 35). However, as this Court and the Defendant have detailed, numerous medical examinations, tests, x-rays, pelvic ultrasounds, and MRI's showed unremarkable or normal results. Also, Plaintiff testified, and the record indicates, that she does laundry, carries loads of laundry up and down stairs, does the dishes, goes shopping, drives, visits with her boyfriend, and helps her son with his homework. In reviewing the record as a whole, the ALJ sufficiently pointed to medical evidence, including evidence from Dr. Krafty herself, that contradicts Dr. Krafty's medical opinion that Plaintiff required full freedom to rest throughout an 8-hour work day. As a result, it was not error for the ALJ to have discounted Dr. Krafty's medical opinion and the ALJ's decision is supported by substantial evidence in the record.[37]

**V.      Conclusion**

Based on the foregoing, the Court finds that the ALJ's statements regarding Plaintiff's previous denials for DIB and SSI, secondary gain, and Plaintiff's use of prescription medication are not evidence of bias against Plaintiff or predisposition to rule against her, and the ALJ did not err by discounting Dr. Krafty's medical opinion. After careful review and consideration of the entire record, the Court further finds that the ALJ's decision as a whole is supported by substantial

---

[37]

Because the ALJ found that Plaintiff lacked credibility, he also discounted the opinion of Dr. Victor Jabbour that Plaintiff could stand and walk for only one hour or less and sit for less than six hours during an eight-hour workday because his opinion was based on Plaintiff's recounting of her medical history. (R. at 32). This conclusion is also supported by substantial evidence because Plaintiff's treating physician, Dr. Krafty, found that Plaintiff could sit for eight hours and stand and walk for up to four hours. (R. at 359). Additionally, a residual functional capacity assessment performed by the Social Security Administration found that, based on Dr. Victor Jabbour's assessment, Plaintiff could sit, stand and walk for up to six hours. (R. at 557).

evidence in the record.  Therefore Plaintiff's Motion for Summary Judgment [7] is denied and

Defendant's Motion for Summary Judgment [9] is granted.  The decision of the ALJ is affirmed.

     An appropriate order follows.


                        BY THE COURT:
                        *s/ Nora Barry Fischer*
                        Nora Barry Fischer
                        U.S. District Judge


cc/ecf:  All counsel of record
Date: January 29, 2010